

R

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
# Civil Cover Sheet

**Plaintiff(s):** UNITED STATES OF AMERICA

**Defendant(s):** AUGUST C. GHILARDUCCI

**County of Residence:** US, Outside the State of IL

**County of Residence:** US, Outside the State of IL

**Plaintiff's Address:**

1) AUSA
2) Joseph A. Stewart
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604

**Defendant's Attorney:**

August C. Ghilarducci
#15100-424
Sandstone - FCI
P.O. Box 1000
Sandstone, MN 55072

**Basis of Jurisdiction:**

☐ 1. U.S. Government Plaintiff

☑ 2. U.S. Government Defendant

☐ 3. Federal Question
(U.S. gov't. not a party)

☐ 4. Diversity

**Citizenship of Principal Parties** (Diversity Cases Only)

**Plaintiff:**

**Defendant:**

08CV4872
JUDGE COAR
MAGISTRATE JUDGE MASON

**Origin:**

☑ 1. Original Proceeding

☐ 2. Removed From State Court

☐ 3. Remanded From Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred From Other District

☐ 6. MultiDistrict Litigation

☐ 7. Appeal to District Judge from
Magistrate Judgment

**Nature of Suit:** 510 Motion to Vacate

**Cause of Action:** 28:2255

**Jury Demand:** ☐ Yes   ☑ No

**Signature:** _Jos Ch_

**Date:** 8/26/08

**FILED**

AUG 2 6 2008
AUG 26 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Coar
Mason

02CR1101

CASE NO. _08 cv 4872_

ATTACHMENT NO. _1_

EXHIBIT _____

TAB (DESCRIPTION) _____

759

1   Q.  Yes.

2   A.  I'm not -- probably in the 2 to $300 range.

3   Q.  Just trying to figure out for your hourly rate of 2 to

4   $300, what was it that you were doing in advising him?

5   A.  Well, if I could -- if I was going to tell you what that

6   was, I would have to tell you.  I would have to go into what I

7   was telling him.  Mr. Ghilarducci has always told me that he

8   was satisfied with my representation of him.  I mean you're

9   suggesting something I don't --

10            MR. DRANDELL:  I object.  It's nonresponsive.

11            THE WITNESS:  Well, you're asking me --

12            THE COURT:  I understand.  Go ahead.  Ask the

13   question.

14            THE WITNESS:  What is your question?

15   BY MR. DRANDELL:

16   Q.  I'm asking for the fee that you charge.  What was your

17   duties and responsibilities in helping him prepare these

18   interrogatories for this important --

19   A.  My duties were to act as his lawyer.

20   Q.  And I'm trying to figure out what does that include.

21   You're saying it's just as a note taker?

22   A.  What does it include?  It includes giving him advice,

23   telling him what the consequences of this investigation might

24   lead to for him personally.  For example, but you see now I'm

25   going to have to get into things.  But there's questions of --

1    I mean there in broad terms without me telling you what I told

2    him, there's questions of the Fifth Amendment.

3    Q.   Speaking of the Fifth Amendment --

4    A.   There's all kind of questions here that I can't get into.

5    Q.   Did you appear before a grand jury testimony in this

6    matter?

7    A.   I did.

8    Q.   And were you represented by counsel at that meeting?

9    A.   No, I was not.

10   Q.   Wasn't Greg Jones present with you?

11   A.   No, not as --

12   Q.   Who is Greg Jones?

13   A.   Greg Jones is a partner of mine.

14   Q.   And did you have him come with you --

15   A.   He came over to the meeting -- to the -- where you -- to

16   the lounge area.  Of course, I had to go into the grand jury

17   alone.

18   Q.   You went to the grand jury alone.  You had Mr. Jones there

19   in case you had to go out --

20   A.   If I had to go out, Mr. Jones was there, yes.

21   Q.   And that would be on any questions that you felt would

22   incriminate your Fifth Amendment rights?

23   A.   No.  Just that he would be there, but I never went out.  I

24   never asked him.

25   Q.   Were you interviewed by the FBI regarding this

1    investigation against Mr. Ghilarducci?

2    A.   I don't think I was interviewed by the FBI.  I gave

3    documents to the FBI regarding Harry Sweet.  As custodian of

4    the records, Mr. Ghilarducci was asked to produce certain

5    records, and they asked through me, and I think that

6    Mr. Ghilarducci was actually the recipient of that, I think.

7    At any rate, I did produce on behalf of Mr. Ghilarducci

8    records to the FBI about the Harry Sweet matter.

9    Q.   That was because you were in possession of those records?

10   A.   No, it was Mr. Ghilarducci was in possession, but they

11   asked me, and I got them for him.  I reviewed them.  I had

12   them Bates-stamped, and I had them delivered to

13   Mr. Scorintino, I believe, a U.S. Attorney here in Fresno.

14   Q.   In talking about the interrogatories, you were asked to

15   look at page 9 and the question regarding were you aware of

16   any complaints, consumer complaints?

17   A.   Yes.

18   Q.   You indicated that you prepared an exhibit.  Was that an

19   exhibit you prepared from documents that you received from

20   Mr. Ghilarducci?

21   A.   I'm going to have to try to remember that.  Let me look

22   and see.  Yes, it would have come from documents or verbal

23   information from Mr. Ghilarducci, yes.

24   Q.   And you prepared exhibits?

25   A.   Yes, I did.  I compared exhibits -- some of the exhibits.

 1  were actual documents that Mr. Ghilarducci had in his

 2  possession.  For example, Exhibit 2, Exhibit 1, "Articles of

 3  Incorporation," Exhibit 2, corporate minutes.  Those came from

 4  Mr. Ghilarducci.  Exhibit 3, "Form of contract used for leased

 5  funds."  It was a form of a contract.  That was from

 6  Mr. Ghilarducci.

 7  Q.  Didn't you help Mr. Ghilarducci prepare those documents?

 8  A.  He would prepare them.

 9  Q.  Did you help prepare them?

10  A.  No, he would prepare them, send them to me.  I would

11  review them.  I would make some comments that I'm not at

12  liberty to tell you about.

13  Q.  And, Mr. Grippo, with respect to the question about offers

14  of refund, you said no offers of refund were made.  Isn't it

15  true that Mario Apprendi asked for and received a refund back

16  of their monies?

17  A.  Who is that.

18  Q.  Mario Apprendi?

19  A.  I don't know that name, Mario Apprendi.  I don't know

20  that.  I never heard of that name.  But the fact that no

21  refunds were offered is information I obtained from

22  Mr. Ghilarducci.  He would have known that, and he gave me the

23  answer that was written down here.

24  Q.  When you act as an attorney for clients at $300 a hour,

25  would you ask to see their records, their businesses -- their

1 | business records?

2 | A.  On some cases you would, yes.

3 | Q.  In this case, did he?

4 | A.  Well, I think we did.  I think we asked him, yes.  I asked

5 | Mr. Ghilarducci if there was any refunds, and he said no.

6 | Q.  Now, with respect to this meeting that you had in January,

7 | is it your testimony at the first meeting, your testimony is

8 | that you give a list of the 23 Confirmation of Funds

9 | transactions up to that point.

10 | A.  That was the -- the civil demand was a document of some

11 | length, and this was an Exhibit 2.  It was delivered to

12 | Mr. Roberti with Mr. Ghilarducci, and I delivered it to him on

13 | that day is the way I remember it.  Now, maybe I sent it

14 | ahead.  I can't remember it, to be honest with you.

15 | Q.  So it was either sent before or at that time?

16 | A.  Yes.

17 | Q.  You're saying you had another meeting later on

18 | approximately a month later?

19 | A.  Yes.

20 | Q.  Were you aware prior to that meeting that Mr. Ghilarducci

21 | had performed another Confirmation of Funds transaction with

22 | Harry Sweet?

23 | A.  I wasn't aware of the day of the meeting.  In other words,

24 | Mr. Ghilarducci came to my office.  Now, I don't know that I

25 | can go into what he told me, but I can't tell you that I

1   immediately -- this is the way I remember.  I immediately took
2   him over to the Attorney General's office, and then I said to
3   the Attorney General that we have some -- something we want to
4   tell you.  And in front of the Attorney General,
5   Mr. Ghilarducci told him that there was a 24th.
6   Q.  Is that common for you in your advice to go into a meeting
7   with an Attorney General that has the kind of power that they
8   had in this case, in the midst of a civil investigation demand
9   to allow your client to speak on his behalf?
10  A.  Yes.  That -- when I say, yes, that would be appropriate
11  in this case.
12  Q.  You wouldn't have given Mr. Ghilarducci the advice to not
13  say anything without first talking to you?
14  A.  I think if you asked me what I told Mr. Ghilarducci along
15  those lines, I would have to go into the question of what --
16  how I advised him prior to even going to the Attorney General
17  the first time, which I am not at liberty to talk about now.
18          But the decision was made -- of such a nature, that
19  we were at the Attorney General's office giving this kind of
20  information.
21  Q.  So you allowed Mr. Ghilarducci to --
22  A.  I didn't allow him.  He did it himself based on after I
23  gave him the pros and cons, if you will, of cooperating with
24  the Attorney General versus taking the Fifth Amendment, versus
25  other alternatives and so on.  Mr. Ghilarducci made his own

1   mind up about what course of action he wanted to take.

2   Q.  So you're saying he was taking a course of action to

3   cooperate?

4   A.  Well, yes.  That's what we ended up doing after he was

5   given advice in various ways that he could conduct himself if

6   he wanted to.  It was his choice.

7   Q.  Now, let's go through this letter here --

8          THE COURT:  Before we get into the letter, we'll take

9   our afternoon recess.  Now, what we're going to do, we're

10  going to take our regular 15-minute recess, and then I'm going

11  to convene with the parties.  We had a few issues that we

12  handled in the hallway.  I have to get that on the record, so

13  it will take longer than the 15 minutes, but we'll keep you

14  apprised.  But regardless, we'll break today at 4:00.  So

15  you'll take your afternoon recess.  We'll get back to you as

16  soon as possible.  Remember the admonition.

17          (Jury excused.)

18          THE COURT:  Okay, the jury has left for its break.

19  Mr. Grippo, what we're going to do, we're going to take a

20  15-minute break, and I need to have the lawyers come back in.

21  There's some issues we took up sidebar, and I need to let them

22  put that on the record, and then we'll call you back in.

23          Let's take 15 minutes, and then we'll come back in,

24  and we'll go back on the record outside the presence of the

25  jury.

# GRIPPO & ELDEN

Suite 3600
227 West Monroe Street
Chicago, Illinois 60606

(312) 704-7700

FAX:
(312) 558-1195
(312) 263-7356

To Call Writer Direct
(312) 704-7720

October 12, 1998

Charles G. Fergus, Esq.
Assistant Attorney General and
    Chief, Consumer Fraud Bureau
State of Illinois Building
100 West Randolph Street
Chicago, IL 60601

Re:    **Westchester Financial Associates, Inc.**
       **Civil Investigation Demand No. 97-63**

Dear Mr. Fergus:

We are submitting this position paper to you to show that:

1.    It would be appropriate for the Attorney General's Office to resolve its Civil
Investigation Demand No. 97-63, under the Illinois Consumer Fraud Act pursuant
to a reasonable settlement with Westchester Financial Associates, Inc.
("Westchester") and August C. Ghilarducci ("Ghilarducci") (collectively, the
"Respondents"), regarding their activities in connection with entering into so-
called Confirmed Funds Contracts, and

2.    The facts and the law do not support any criminal action against the Respondents
regarding such activities.

We respectfully request that you deliver a copy of this paper to the Criminal
Division of the Attorney General's Office as we understand this matter is still being reviewed by
that Division.

Exhibit N.

# GRIPPO & ELDEN

Charles G. Fergus, Esq.
October 12, 1998
Page 2


This position paper is divided into the following nine sections:

I.      A Description of Bank Debenture Trading;

II.     Respondents' Good Faith Belief In Bank Debenture Trading;

III.    MFC Bank is a Bonafide Funding Source;

IV.     Reasons For The Failures To Close;

V.      Happy Letters;

VI.     The Only Complainant Not Bonafide;

VII.    An Overview;

VIII.   Legal Analysis; and

IX.     Conclusion


Because bank debenture trading and the Respondents' related activities are so complex, it is necessary to go into significant detail in order to demonstrate Respondents' lack of wrongdoing. Section VII constitutes a brief overview of the facts, but it cannot be understood without a careful review of the prior six sections.

## GRIPPO & ELDEN

Charles G. Fergus, Esq.
October 12, 1998
Page 45

### IX. Conclusion

      As you are aware, pursuant to negotiations with your Office, Respondents sought

to resolve this investigation by agreeing to: (i) cease engaging in the Confirmed Funds business,

(ii) settling with Bashan, (iii) contributing to a consumer fraud education fund, (iv) resolving any

future complaint by the one Illinois Contract holder, and (v) otherwise complying with the Act.

Respondents asked only for a release from Bashan and an agreement from your Office to close

both your civil and criminal file in this matter.

      Respondents' offer was rejected, which led to the preparation of this paper as a

way to ask your Office to reconsider a reasonable settlement. After going to the effort of

preparing this document and reviewing all the evidence, it appears that Respondents' original

settlement offer was a generous one, perhaps overly generous. In any event, we would welcome

the opportunity to engage in discussions with you to fairly and reasonably settle this matter short

of litigation.

                      Respectfully Submitted,

                      Theodore W. Grippo,
                      on behalf of the Respondents

TWG/llr
Enclosure (Exhibits)

cc:    Westchester Financial Associates, Inc.
       August C. Ghilarducci

## AFFIDAVIT OF FACTS

I, Ronald J. Richardson of 16811-045, FPC, P O Box 725, Edgefield, South Carolina 29824, being over the age of twenty one years, being competent to testify, having first hand knowledge of the events as stated herein, do affirm that the facts herein are true, correct, complete, and not misleading, and to those facts Affiant belives to be true with full knowledge and belief, are stated under penalty of perjury and bearing false witness, so help me God.

All references to Motions, Indictment, Superseding Indictments, in case 02-cr-1101 in the United States District Court for the Northern District of Illinois and corresponding Appellate Court for the Seventh Circuit in Chicago at Case citation 480 F.3d 482 (7th Cir. 2007); pursuant to U.S.C. Title 28 § 1746.

1.  Affiant was the only co-defendant of August C. Ghilarducci in the above styled case.

2.  Affiant resided in Atlanta, Georgia and co-defendant Ghilarducci resided in Chicago, Illinois.

3.  The trial preparation took place in Chicago, Illinois.

4.  Co-defendant Ghilarducci was assigned Attorney Gerald Collins to represent his charged offenses.

5.  During the course of the trial preparation process, Affiant was in several meetings with co-defendant, Attorney Collins, and Affiant's counsel, Attorney Philip Turner.

6.  From the on-set it was reasoned that both Attorney (s) would have a difficult time working the joint case. As in any time together, there were good days and there were bad days.

7.  At some point in time during the trial preparation, Attorney Collins (co-defendant's counsel) asked Affiant to e-mail some information to him. Attorney Collins made it chrystal clear that Affiant was not to give the e-mail address of Attorney Collins to his client, co-defendant Ghilarducci. I asked why and was told that he [co-defendant] would want him [Attorney Collins] to work on the case and he [Attorney Collins] had way to much work to do.

8.  There was approximately two years to prepare for trial, yet no work was consumed until about 30 days prior to trial.

9.  Affiant's Counsel continuously and without interruption mocked counsel for co-defendant's performance.

-1-

Exhibit O.

10. Co-defendant's counsel [Collins] was asked to draft the requisite subpoena's by his client, co-defendant Ghilarducci. Attorney Collins informed co-defendant Ghilarducci in Affiant's presence that he [Collins] was way to busy to draft any subpoena's. Further, Attorney Collins directed that return of the subpoena's be to Affiants counsel, Attorney Turner as he [Collins] was way to busy to answer and follow up on the subpoena's.

11. During the days leading up to the trial, Attorney Collins directed his client [co-defendant Ghilarducci] to draft a list of questions that he wanted asked of each Government witness.

12. At trial, Attorney Collins directed co-defendant Ghilarducci to prepare each and every trial defense exhibit.

13. At trial, Attorney Collins was unable to follow a disciplined order for numbering the defense exhibits.

14. At trial, Attorney Collins, due to the fact that he was engaged by the office of the Federal Defender; transcripts were made available. The transcripts accumulated and Affiant reasoned that neither Affiant's counsel or co-defendant's counsel were interested in the transcripts, so Affiants asked for and was granted permission to take them.

15. During the closing of the trial, in summation, co-defendants counsel urged the jury to find co-defendant guilty of all charges.

16. During the trial, at co-defendant's direct, co-defendant was asked by Attorney Colins to put together the exhibits that he [co-defendant] wanted used and a list of questions. Attorney Collins never participated and did not review. Co-defendant had no access to a copier or the funds required to make copies, so co-defendant utilized a fax/copier machine. This led to a fax header being removed from one of the 20 or so sets of defense exhibits used by co-defendant on his direct. The Government seized upon this error and obstruction charges were added. It is doubtful that this would have occurred if the documents, defense direct exhibits had been prepared by Attorney Collins.

17. Co-defendant did develop a better rapport with Affiant's Counsel, Attorney Philip Turner. Co-defendant was attempt-to defend multiple counts, one of whcih included a railroad bond issue. Affiant's counsel worked with co-defendant when it was reasoned that Counsel Collins would do little or no work on the railroad bond issue.

-2-

18. Affiant and co-defendant Ghilarducci worked closely together, both motivated to find a reasonable resolution to the offenses charged. At no time did Affiant hear that Counsel Collins thought that co-defendant or Affiant should enter a plea to to any reduction in charges.

19. Co-defendant Ghilarducci often complained that he was unable to make contact or receive the courtesy of a return phone call from his counsel, Attorney Collins. The case was mildly difficult, required a reasoned amount of preparation time and the development of a trial strategy or plan. None seemed to exist with either counsel. Both defendants were not learned in the law.

20. 1f Affiant were asked more direct questions, Affiant could expand the record.


**FURTHER AFFIANT SAYETH NOT**


**Executed under penalty of perjury.**


AFFIANT: Ronald J. Richardson
         16811-045
         Federal Prison Camp
         P O Box 725
         Edgefield, SC 29824


In witness whereof, I have hereunto set my hand and seal on this 20th day of December, 2007, after verifying the identity of the Affiant.

NOTARY SEAL

**LYNN W. GRUBB**
My Commission Expires May 30, 2011

-3-

AFFIDAVIT OF AUGUST F. GHILARDUCCI

I, August F. Ghilarducci, was born September 28, 1931. I am a citizen of the United States of America and a Veteran of the Armed Forces. I reside at 12958 So. Meade, Palos Heights, IL 60463. I am presently retired. I have first hand knowledge of the events as cited herein and state them with full belief that they are true and accurate to the best of my ability.

I am the father of August C. Ghilarducci, currently incarcerated in Federal Correctional Institution at Sandstone, Minnesota.

I am familiar with the criminal cases involving my son. I traveled to Fresno, California to help secure his bond in that matter. In Chicago I not only followed the events of the trial, but was in attendence and called by the government to testify.

I personally met and spoke with Attorney Gerald Collins.

I personally met and spoke with Phil Turner, Attorney for Ron Richardson.

I specifically remember a conversation that I had with Attorney Collins on the day I gave my testimony. This took place in the cafeteria of the Dirksen Federal Building. Present were my late wife, Marie, Leeann Conroy, Collins and myself. We were having coffee. Collins advised us that the government had no case against my son.

On another occasion in a conference room at the Federal Building, FBI Agent Turlington was in conversation with Marie Ghilarducci and myself. When he left the room Collins again advised us that there was no problem; the government did not have a good case.

I specifically recall a conversation Marie Ghilarducci and I had with Phil Turner during trial recess in the rear of the courtroom. Attorney Turner assured us that the government had no case, that the proceedings were a waste of time. Also present for this conversation was Victor Cacciatore, Jr., and associate of Turner's. Cacciatore concurred with Turner.

Throughout his adult life, my son routinely discussed important matters in his life with me. This criminal matter was no different. We spoke often, primarily at my home which he would visit weekly. I specifically remember a conversation we had some months before his trial. It was abundantly cleat that Collins and Turner had convinced him the had a very stong defense. Not once did we discuss any type of plea bargain or government offer.

I was very concerned about this situation. I found it peculiar that they were not attempting to plea bargain. I felt that it would be worth seeing what the government would offer. On several occasions I mentioned this to my son. He told me that they were not even discussing a plea bargain, that the government case was not strong and that he would testify and explain everything to the jury.

I had no knowledge of the type of sentence my son was facing. Had I known the risk of trial versus the benefits of pleading guilty, I would have advised him to make a deal with the government. I would have supported this decision.

I am prepared to testify under oath to the above stated facts and answer any questions about this subject.

Exhibit P.

Affidavit of August F. Ghilarducci, page 2

Dated this 29th of June, 2008 at Palos Heights, Illinois.

_August F. Ghilarducci_
August F. Ghilarducci

_Susan M. Klinian_
Notary Public

# AFFIDAVIT OF LEEANN MARIE CONROY

My name is Leeann Marie Conroy, born October 10, 1971. I am a citizen of the United States of America. I live at 808 Foiz Blvd. Moose Lake, Minnesota 55767.

If called and placed under oath, I would testify to the following:

I am engaged to August C. Ghilarducci. We lived together from May 1996 until the date of his incarceration, July 18, 2005.

I was employed by Ghilarducci at Westchester Financial Associates, Inc. for all times relevant to the indictment. As such, I spoke regularly with the clients of Westchester Financial Associates, Inc. I regularly read and typed correspondence and other documents. I am familiar with the issues of the indictment and trial.

I am acquainted with Attorney Gerald Collins. On numerous occasions I personally discussed Ghilarducci's trial and trail preparation with him. Most of these conversations took place in our home. Collins never mentioned the possibility of a guilty plea and the risk of going to trial.

I am personally acquainted with Attorney Phillip Turner who represented Ron Richardson. On multiple occasions I discussed with Turner Ghilarducci's trial and trial preparation. This included numerous telephone conversations, meetings at our home and one dinner specifically at our home, which I recall in detail.

I personally viewed emails sent from Turner to Ghilarducci, which clearly stated, "we will win." The reason given time and time again was the contract and its language. I engaged in lengthy conversations with Turner regarding this subject. Not once did he mention the possibility of losing the case, or the consequences of going to trial.

I personally discussed the criminal matter almost every day with Ghilarducci from the time of the indictment until his self-surrender. Not once did Ghilarducci discuss a guilty plea bargain. Further, it was never mentioned by Mr. Collins or Mr. Turner.

I recall personally seeing a letter from Mr. Levin about pleading guilty and Racketeering.

Had I known the risks Ghilarducci faced by going to trial, the fact the contracts were not a defense and the different sentences available for pleading guilty cooperating, I would have encouraged and supported Ghilarducci to plead guilty.

I personally typed numerous documents to Collins from Ghilarducci concerning other parties, which Ghilarducci offered to cooperate. I can still recall those names. I retained copies of many of those documents.

I personally typed "Lines of Questioning" written by Ghilarducci for Collins for many of the government witnesses that testified at trial. I personally assisted Ghilarducci in preparing the "Defense Exhibit Books."

Signed this 23rd of June 2008 at Moose Lake, Minnesota.

Leeann M. Conroy

GERENE M. JOHNSON
Notary Public—Minnesota
My Comm. Expires Jan. 31, 2011

Gerene M. Johnson
6-23-08

Exhibit Q.

## Affidavit of August C. Ghilarducci

I, August C. Ghilarducci, born June 6, 1960, present address 15100-424 / F Unit, Federal Correctional Institution, P.O. Box 1000, Sandstone, Minnesota 55072, hereby submit the following Affidavit of Facts relevant to case 02-CR-1101 in the Northern District of Illinois.

My trial counsel was Gerald Collins ("Collins"), a panel lawyer from the Federal Defender's Program; my appellate counsel was Daniel LaFave ("LaFave"); my co-defendant was Ron Richardson ("Richardson"); co-defendant's counsel was Phillip Turner ("Turner"). I operated an Illinois corporation known as Westchester Financial Associates, Inc. ("WFA"). My trial counsel in Fresno was Harry Drandell ("Drandell").

1)  I was indicted in Federal Court in the Northern District of Illinois on November 16, 2002. Trial commenced on October 20, 2004 and on December 17, 2004 the jury convicted me of racketeering, wire fraud, money laundering, false statements on a loan application and filing a false tax return.

    I was sentenced to a term of incarceration of 190 months.

2)  I was also indicted in Federal Court in the Eastern District of California on December 12, 2002 and went to trial March 1, 2005. On April 5, 2005 the jury convicted me of mail fraud and money laundering. I was sentenced to prison for a term of 33 months to run concurrent to the sentence imposed in Chicago.

3)  Luis Galvan of the Federal Defender's Program in Chicago personally notified me that he would be serving as my lawyer. Our meeting at his office lasted less than twenty minutes.

4)  At some point thereafter I received a telephone call from Collins, a panel lawyer from the Chicago Federal Defender's program advising me that he, not Galvan, would be representing me.

5)  Collins was a sole practitioner without secretary, law clerk or paralegal. He never requested funds

from the court for this type of assistance despite the size of the case.

6)    The case contained approximately 200,000 pages of documents and a government witness list of more than 80 people.

7)    During the months he represented me up to the summer of 2004, Collins told me he was busy handling other cases. He frequently cancelled or failed to show up for meetings that were arranged at Turner's office. At the time of trial he was busy with a high media profile case representing Nick LaCoco. At the conclusion of my trial he immediately began another trial in Federal Court. He was preparing for that trial while my trial was still going on.

8)    Due to his hectic schedule he was too busy to file Post Trial Motions timely, even though Judge Coar gave him a 30-day extension to do so. This is represented in the papers filed at the time he was seeking an additional extension. He had me physically file these documents, as he was too busy.

9)    On February 20, 2005 Collins sent to me a fax requesting that I prepare the Post Trial Motion. I complied and sent the information to him. Yet and still he failed to file Post Trial Motions timely; as such I was foreclosed from presenting them to the Court.

10)   Collins failed to prepare a Joint Defense Agreement involving Turner/Richardson. In spite of this, I was allowed complete access to Turner outside the presence of his counsel. This included dozens of meetings and hundreds of telephone calls, faxes and emails. At one point, pre trial, the government raised the issue in court wondering if I was paying Turner to do work for me. I was not.

11)   Prior to the trial Collins never explained the Sentencing Guidelines to me nor did he explain my exposure based upon the charges in any of the four indictments. The first time he explained the Sentencing Guidelines to me was after I returned from the trial in Fresno to prepare for sentencing

2

in Chicago.   This was when Collins and I reviewed the Pre Sentence Report (PSI).

12) I was unaware of the potential sentence I was facing until I received a copy of the PSI that Collins sent to Drandell to give to me while I was trial in California.

13) Prior to the instant case I had never been arrested and had no criminal history, except for a few traffic tickets.    I had no experience or understanding of how the Federal Justice System worked.

14) Collins never reviewed with me the charges in any of the indictments.   He never explained to me what the Government needed to prove to obtain a conviction. He submitted a written Declaration to Federal Court in Fresno in which he states I was charged with Mail Fraud in Chicago.   I was not.   Had Collins reviewed the charges with (and Calculated Sentencing Guidelines with me) he would have declared to the Court the highest charged offense, which was Money Laundering.

15) I did, almost immediately after Collins was appointed to represent me, advise him that I was willing to provide information and documents to the government about the parties from whom I bought the Railroad Bonds and Confirmation of Funds Letters. I provided Collins with documents to substantiate what I could offer.   Collins told me it was "too soon."   We did not go back to the topic until after conviction but prior to sentencing at which time he asked me for copies of this information to present to Mr. Levin.

16) I had raised the same issue with prior counsel who took it so far as to ask me whether I would "be willing to wear a wire."

17) On numerous occasions during the pretrial phase I reiterated to Collins my willingness to plead guilty.    This was related to the Government questioning my father and Leeann Conroy, both of whom had to retain counsel.   I stated my desire to avoid them being indicted and that I would plead

3

guilty to avoid this.  Again, I was told it was "too
soon"; we did not discuss any specifics.

18)  I was aware that co-defendant Richardson and his
counsel  met  with  the  government  on  several
occasions.   However,  Richardson  and  I  were
prohibited  by  an  order  of  the  court  from
communicating with each other outside the presence
of our lawyers.

Not once did we, neither Richardson and myself nor
Richardson, Turner, Collins and I ever discuss a
plea agreement.  To this day I do not know what Plea
Agreement the Government offered to Richardson.

19)  On March 3, 2004 AUSA Levin sent a fax to Collins
that I also received via fax.  This letter gave me
two days to plead guilty before superceding the
indictment with Racketeering Charges.

20)  I showed this letter and discussed it with Leeann
Conroy, my fiancé.

21)  Collins never discussed the contents of the letter
with me.  Specifically, he never explained to what
the inclusion of racketeering charges meant and the
significant effect these charges would have on the
trial, the jury instructions and sentencing.

22)  Collins did not make himself familiar with the
strength of the government's case prior to the March
5, 2004 deadline imposed in AUSA Levin's offer.
Specifically:     (a)  he  did  not  interview  any
government or defense witnesses, except Ted Grippo,
(b) he did not review the voluminous documents of
the government although they were available to him.

23)  Collins made a written Declaration in Federal Court
in Fresno, California wherein he misstates to the
court the charges for which I was accused.

24)  To the best of my knowledge Collins never met with
the government to assess the strength of their case,
discuss cooperation or terms of a guilty plea.

25)  Collins never asked me to meet with the government
to learn of their offer nor discuss any potential

4

benefit based upon my plea and the information I could provide.

26) Collins did not explain to me the strength of the government's case, the overwhelming conviction rate of the federal government or the incredibly remote odds of winning back-to-back trials against the federal government.

27) In preparing for trial, Collins never sought funds for an expert witness even though Richardson and I presented several who were willing to testify.

28) Collins had me prepare the cross-examination questions for all government witnesses and direct examination questions for all defense witnesses, as well as all the questions for my own testimony. He had me prepare the "Defense Exhibit Books" and provided no assistance or review of these books. He also requested that I prepare the Post Trial Motion. I had no legal training or experience to allow me to be responsible for these tasks.

29) Collins never explained to me the risks or consequences of testifying. I asked Collins what we were going to do to prepare me from cross-examination. He told me, "you are on your own for that." There was no preparation.

Collins never explained the benefit available for Accepting Responsibility nor did he explain the likely enhancement for perjury and/or obstruction of justice for testifying.

30) Collins never discussed with me, nor recommended to me, the sound logic of entering a plea agreement as a means to reduce sentencing exposure.

31) In 1997 I was the subject of an investigation by the Illinois Attorney General's Office for the same transactions that were the object of the instant case. Attorney Ted Grippo and his associate, Greg Jones, a former AUSA, represented me in this matter.

32) With respect to this investigation Grippo and Jones provided me with a complete explanation of the risks involved including prison, fines, forfeiture,

5

injunctions and the like.  They also presented options available to me that included cooperating with the Illinois Attorney General with hopes of minimizing penalties and punishment.

33) After carefully weighing the options I elected to cooperate with the government and acknowledge my actions and provide them with information about those who provided the Confirmation of Funds Letters.  Grippo offered to set up a call between the Attorney General and a party who sold to me some of the Letters I resold.

34) I made Collins aware of these facts pertaining to the Illinois Attorney General investigation and provided him with documents from Grippo detailing what had been done by way of cooperation.  Evidence of these matters pertaining to the Illinois Attorney General exists.

35) Throughout the course of our professional arrangement there were numerous situations where Collins dispensed legal advice to me about important legal issues.  Specifically:

   A. He advised me to waive attorney client privilege.
   B. He advised me to confirm to the court that we would not use Reliance Upon Advice of Counsel as a defense.
   C. To release certain parties from subpoenas.
   D. To testify at trial.
   E. To stipulate to certain exhibits and matters at trial.
   F. To release the jury and not have them hear the sentence enhancements.
   G. To not give any explanation of the case to Ms. Zammuto, Probation Officer in preparation of the PSI.

   These are some examples of situations where Collins recommended a course of action that I did not agree with.  However, after he explained his rationale I deferred to his logic and experience and followed his advice.  I can demonstrate a similar behavior pattern with other lawyers, including Grippo and Drandell, where I took advice after hearing the options available.

6

36) Had Collins explained to me the risks and consequences of trial and given me his professional opinion to negotiate the best possible plea agreement, I would have accepted this advice.

37) Prior to the trial, on many occasions, through emails, telephone calls and at meetings, Turner told me categorically "we will win" citing and explaining the risk warnings and the merger and integration clauses of the contracts as being basis for his statements. Turner made these statements on many occasions in the presence of Collins, who concurred.

38) Both attorneys made these statements in the presence of my family as per their attached affidavits.

39) On numerous occasions Leeann Conroy viewed emails sent to me by Turner saying clearly, "we will win."

40) Collins never presented any information or research to the court nor myself supporting the theory of the contracts as a defense to the charges.

41) Appellate lawyer, LaFave, in his Anders' Brief researched the issue with many 7th Circuit citations concluded the contracts were not a defense to the charges in the indictment. The Court of Appeals upheld LaFave's findings on this topic, as did the United States Supreme Court.

42) Had Collins advised me that the contracts were not a defense supported by case law I would have not gone to trial.

43) I did not make an informed decision to go to trial in this case. I was presented only with a recklessly optimistic assessment contrary to prevailing case law in the 7th Circuit.

44) I did not understand the Sentencing Guidelines, having received not explanation about the potential sentence I faced by going to trial and testifying. I had no knowledge that my sentence would be based, in part, upon total money involved in all transactions, not just the amount I received.

7

45) I did not understand the significant amount that my sentence would have been reduced by for accepting responsibility and likely further reduced by cooperation and eliminated the need for two Federal Trials.

46) Collins did not accept the government's invitation to learn of their offer and negotiate something significantly better that what I received at trial.

47) Had Collins not failed to present the fundamental information to me, had he given me a reasonable assessment of the situation after reviewing the evidence and case laws, I absolutely would have accepted any reasonable offer the government presented to me as a plea bargain.

I am of legal age to prepare this affidavit, mentally competent and with personal knowledge of all events detailed in this document.

I affirm these facts to be true and correct with full knowledge and belief and make these statements under penalty of perjury, so help me God.

Signed this **14th** of August 2008, at FCI Sandstone, Sandstone, Minnesota.

_____
August C. Ghilarducci

DEBORAH C. JENSEN
Notary Public-Minnesota
My Commission Expires Jan 31, 2011
08-13-2008

8